SCHEMMEL et al. v. HORNBLOWER et al.
No. 5640.

Circuit Court of Appeals, Seventh Circuit.
July 21, 1936.

Arthur E. Fixel and William Henry Gallagher, both of Detroit, Mich., for appellants.

J. F. Dammann, Charles Y. Freeman, and Sidney K. Jackson, all of Chicago, Ill. (Wilson & McIlvaine, of Chicago, Ill., of counsel), for appellees.

Before EVANS, Circuit Judge, and LINDLEY and BRIGGLE, District Judges.

EVANS, Circuit Judge.

This appeal is from a judgment for appellees entered upon a directed verdict at the close of appellants' case. The action was in tort for damages sustained by reason of appellees' alleged fraud in inducing and executing a syndicate agreement which concerns itself with the marketing of stock in Backstay Welt Company, in which appellants were interested. Appellants are the members of the syndicate and appellees the members of the stock brokerage firm, Hornblower & Weeks, which contracted to manage and operate the syndicate. Jurisdiction exists because of diversity of citizenship.

The declaration (filed August 12, 1932) contains two lengthy counts alleging a loss of $465,710.18, which resulted in part from the purchase by the syndicate of 10,000 shares of B. W. Co.'s common stock. This stock was bought at $42.72 per share, and it is alleged the stock now has a value of only $3 per share. One item of the loss, aggregating $40,496.99, covers interest and brokerage charges, and other relatively minor items.

Appellants were and are owners of common stock in the B. W. Co., an Indiana corporation engaged principally in the manufacture of welts, gimps, bindings, and other appliances used chiefly on automobiles and as weather stripping and for refrigerators. The firm of Hornblower & Weeks is engaged in the brokerage business and has offices in eight cities in the United States. The statement of B. W. Co., at the time of listing the stock on the Detroit market, showed 1,170 shares of 2,000 authorized preferred stock issued, and 80,673 shares of 100,000 authorized common stock issued. The present company was formed September 1, 1928. It was originally founded in 1899 as a partnership and first incorporated in 1910. It originated with Schemmel in his work shop. It grew steadily and became a corporation. It continued to expand in the volume of its products. This growth was the result of Schemmel's industry, energy and devotion. Regrettable is it that this worthy offspring should be used as a lure or bait to attract a speculative public. The company's net income for Federal tax purposes for 1930 was $117,319.98.

The alleged false, material representations of fact made as inducements to enter into the contract (which representations were relied on, according to the declaration) were:

(1) Appellees had facilities in their Detroit office which were required to create general trading on the market in B. W. Co.'s common stock, and could do so in a fixed period beginning February 27, 1929.

(2) Appellees would disseminate information among the public regarding the true value and merits of the stock so as to stimulate dealing, and they could overcome the existing indifference of the trading public to the stock, and appellees' representatives believed that the shares had a much greater value than the market value.

(3) Appellees would give the required publicity to the stock's merits to create a wider market.

(4) They would push through customary channels, trading in the stock.

The two appellees served, first filed a plea of the general issue in assumpsit and a couple of years later filed an additional plea of general issue in tort—not guilty. In April, 1934, these two appellees filed a motion for a bill of particulars which the appellants answered seriatim.

After appellants' evidence was in, the appellees moved for a directed verdict, which motion, predicated on the following grounds, was granted:

(1) Insufficiency of the evidence;

(2) Appellants' continued performance of the contract with full knowledge of the alleged fraud when they had the right to rescind and they extended the duration of the agreement and so waived the alleged fraud;

(3) Appellants failed to prove damage as a result of the alleged fraud and deceit and the jury should not be permitted to speculate;

(4) Appellants failed to prove Mc-Donald, in making the statements, was acting within the scope of his employment.

McDonald was in charge of appellees' Detroit market, and it is he who is charged with having made the alleged false representations.

The contract between appellants and appellees, formed by correspondence, provided:

"We * * * are forming a syndicate of which we are to be the managers, but in which we shall not participate, to trade in the common stock of the Backstay Welt Company upon the terms hereinafter mentioned * * *

"The Syndicate will trade in Common Stock of B. W. Co. * * * and in no other security; the commitment of the Syndicate shall not at any one time exceed 8000 shares; and all transactions * * * shall be in accordance with * * * the rules and regulations of the New York Stock Exchange, subject only to the limitations aforesaid the Managers * * * shall have full power and authority, * * * in their uncontrolled judgment and discretion * * * to buy, sell and generally trade in Common Stock * * * either long or short, and at either private or public sale and to deal in puts and calls thereon. * * *

"The profits and losses * * * shall be * * * borne by the participants in the proportion which their respective participations in shares bear to 8000. * * *

"The Syndicate will expire * * * on May 27th, 1929, but in the sole discretion of the Managers may be sooner terminated.

"The managers * * * upon two days' notice may call and the participants shall thereupon pay in cash such amounts on account of Syndicate liability, whether for purchase price, margin or otherwise, as the Managers may deem proper (margin not to exceed 40% of total liability). * *

"Interest and commissions shall be paid to the Managers * * * (of) the Syndicate * * * under the rules of the New York Stock Exchange; * * * nor shall they (managers) receive any other * * * compensation for their services. * * * All (incidental) expenses * * * including legal expenses, advertising, printing, postage and all clearance charges, floor charges and commissions payable by the Managers to other brokers shall be * * * paid by the Syndicate.

"The Managers shall have full discretionary power * * * to borrow money for * * * the Syndicate for any of the purposes covered by this agreement and to pledge as security therefor any of the Syndicate assets in their general loans * * * and also to pledge * * * therefor this agreement and the several obligations of the participants hereunder.

"The managers may in their sole discretion release any participant for any cause and substitute another * * *. In case of any default * * * of any participant his interest * * * may be sold at private or public sale with or without notice and the Managers or any participant * * * may be the purchaser * * * notwithstanding which every such defaulting participant shall be responsible * * (for) his full liability * * *. The Managers may in their sole discretion make * * * such adjustment with any participant as the Managers deem proper. * *

"Upon * * * termination * * * the Managers shall account * * * (for) the assets * * * distribute * * * any shares of stock * * * together with their respective proportions of cash on hand, and in the event of a loss a statement of their respective proportions thereof which the participants shall forthwith pay. * * * Apportionment * * * by the Managers * * * shall be conclusive * * * as shall also be the written statement of the Managers of the result of Syndicate operations. The Managers shall

not be liable under any of the provisions of this agreement or for any matter connected therewith, or for the exercise of their judgment and discretion in the management of the Syndicate except for want of good faith. * * *

"Please confirm your acceptance of your participation under the terms stated above by signing upon the enclosed duplicate * * *."

The acceptance read:

"The undersigned hereby accepts a participation of shares in the above Syndicate upon the terms and conditions above set forth."

On November 14, 1929 the purchasing authorization of the syndicate was increased to 10,000 shares on the same terms as above. The time for operation of the syndicate was extended until December 22, 1930.

The story of appellants' effort to make large profits, their failure to do so, and the large loss which accompanied these efforts is an unfortunate one. Schemmel was in every way qualified to conduct a successful manufacturing business and to meet competition therein in any form. He had considerable experience in other lines, in all of which his efforts had met with financial success.

In 1928, he reorganized this company, the Backstay Welt Company, which in every sense up to this time had been his company and increased the capital about one thousand times.

He was apparently bitten by the bug so prevalent at that time and believed there was a short road to large fortune through reorganization of one of his companies, the increase in amount of capital stock, and the manipulation of its price by insiders. He was intrigued by the thought of a syndicate, and his idea of a manager of a syndicate operating on a big stock board evidently was a sort of a glorified super being —a Napoleon of Finance and a magician who could put stocks in a hat, draw them out, and find they had increased in number by threefold. Another wave of the hand, again in the hat, and behold the price of each share had doubled.

He was, however, a stranger, indeed a babe in the woods, when it came to understanding how the magician manipulated the stock prices. He was keenly conscious of a desire to see it done while he held the bag into which the gold was poured.

It was at this stage of keen eagerness on his part to be a party to a syndicate and to get a close-up view of a magician in action that he met Mr. McDonald, in charge of the Detroit office of Hornblower & Weeks. McDonald apparently admitted without too much reluctance that he was by nature and training unusually well qualified to act as magician manager of a syndicate that was to inflate the selling price (though not the value) of the stock of the Backstay Welt Company. Thus, the syndicate was born. The sky was clear, not a cloud on the horizon—in February, 1929. Alas, Schemmel never learned just what a syndicate was or how it operated. Neither did his associates. McDonald operated it. Aside from his self-confidence, McDonald's abilities were largely nil. At least, his magic did not cause the price of this stock to go up. Perhaps he was a bear magician, not a bull magician. The difference between the two, Schemmel and his associates in the syndicate learned at a cost to them of $464,000.

From a reading of the testimony we conclude that syndicates are formed to raise the price of stock included in the syndicate when there is no special reason for said stock to rise, or when it "ought" to rise and refuses to do so. The *modus operandi* in the instant case was for appellants to furnish the money and the credit with which McDonald was authorized to buy 10,000 shares of stock, or such part thereof as he thought necessary, and to offer the same for sale as his judgment dictated. If the price did not rise, then he was to buy more stock at an increased price (either from himself or others) and this, so it was expected, would result in a public confidence born of this activity and a rise in price, which would beget an eagerness on the part of others to share in the profits of a bonanza. This would continue *ad infinitum* or until the limit of stock purchases (which in this case was increased) was reached and the syndicate would attain its hopes, at least realize its more conservative expectations. Later, the syndicate's books would be closed and the large profits would be divided. There were, so the syndicate members believed, obvious and alluring advantages in such a method of getting rich over the staid old method of collecting interest coupons and dividends.

Unfortunately, in the instant case, for some unknown reason, the magician was unable to work his magic. The prices did

not operate as they should when a well-regulated and well-organized syndicate was working therein. Stocks were bought at higher prices by McDonald, but instead of further rises, there were sags or drops in their prices and then Mr. McDonald, supposedly to increase activity in the stock, would repeat the operation. There was a constant loss, except to McDonald, whose commissions increased as sales and purchases increased.

While appellants speak generally of successful operation of a syndicate which would result in raising prices, they do not, either in their pleadings or their testimony, show how such prices were to be raised. True, the syndicate manager was to buy and sell stocks, the appellants at times being on both ends of the transaction. Such activity was presumably to excite others to make purchases and thereby cause an increase in prices.

It is true the manager stated that he had large experience in such matters and ability to manage syndicates, but nowhere are we told how such syndicates force up prices when there is a disinclination on their part to rise, and more important still, they do not point out wherein McDonald failed as manager. It is possible that his admission of existing qualifications, announced so freely and with confidence-inspiring air, slightly overstated the facts. Men have been known to make such misestimates of their capacities, and such list includes brokers, we are advised. General expressions of self-appreciation even though higher than entertained by friends and acquaintances, and higher perhaps than a fair appraisal by a disinterested party would warrant, have never been considered actionable. If they so became actionable a new and most prolific source of litigation would arise. The letters show conclusively that appellants were familiar with McDonald's doings and at all times expressed their satisfaction with his efforts. While we are at a loss to understand how and why these appellants should continue to advance such large sums of money to buy and sell stock in this company, always at a loss, yet we are equally unable to fasten responsibility for such declines upon appellees or their representative, McDonald. After the financial crash of 1929, it was not difficult to understand how the stock went down.

We are not justified in awarding judgment on transactions prior to the financial crash in 1929 without finding a basis therefor. It is not enough to observe that the stocks did not rise, although McDonald was to impart inflationary tendencies to their lifeless, listless being. We assume that appellants did not expect their syndicate manager to resort to misrepresentation or to use the mails to defraud buyers in order to raise the price of the stock. For if they did we would be compelled to leave them as we find them. It would hardly have inspired confidence had McDonald told the public that the stock of this company had been increased 1,000 fold just before they were invited to buy it. We likewise assume that there are stocks which won't respond; that is to say, to carry the figure of speech further, there are inanimate objects like stocks that do not make good subjects for hypnotic influence. In such cases, members of the syndicate must stoically face the unpleasant fact found to exist by trial and failure.

The syndicate could have been terminated at any time. If the manager failed to do the things appellants wished him to do, or if he failed to advertise the virtue of the stock in the proper way, the enterprise could have been brought to a sudden end. All the correspondence indicates that appellants were, until after the 1929 market crash, thoroughly satisfied with McDonald. Even after that date, the same satisfaction is expressed.

Like the District Judge, we are at a loss to know upon what theory we may hold appellees responsible for the failure of these stocks to rise. It is true, McDonald's admission of superiority as a magician was alluring. Appellants, or some of them, had just gone through an experience with a Chicago broker whose assurances were rosier than his realizations, and they doubtless did as they should have done—accept McDonald for what he was, rather than what he thought he was. Likewise, we are unable to find any ground for holding appellees for the decline in the market which occurred after the 1929 financial crash.

Our conclusion is that McDonald's management was in accordance with appellants' desires. He could not misrepresent, and, without concealment or misrepresentation, the stock, because of its increase in capitalization, could not be made to rise.

The District Judge rightly held that, upon the facts shown, appellants must

stand the loss suffered by them in their efforts to profit quickly and largely through the sale of the stock of Backstay Welt Company which they owned, the amount of which they had greatly increased for their quick enrichment.

The judgment is
Affirmed.